## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**ANNA CATRON,**

> **Plaintiff,**

**vs.**                                                   **CIVIL ACTION NO. 1:20-CV-00576**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY,**

> **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered September 3, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 19, 20, 22)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or for remand (ECF No. 19); **GRANT** Defendant's request to affirm

the decision of the Commissioner (ECF No. 22) **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Anna Catron (hereinafter referred to as "Claimant"), protectively filed her applications on July 7, 2017 (Tr. at 14, 310-316, 317-322) alleging disability since December 15, 2012[1] due to a host of impairments and conditions: degenerative disc disease of the lumbar and cervical spine; osteophytosis of both hips; chronic obstructive pulmonary disease; deteriorating left shoulder; pain disorder; degenerative disease in left foot and ankle; problems with bowels; gastric cardio with chronic inflammation; depression; anxiety; high blood pressure; irritable bowel syndrome; high cholesterol; acid reflux; and stomach ulcers (Tr. at 14, 336). Her claims were initially denied on October 27, 2017 (Tr. at 192-208, 209-228) and again upon reconsideration on February 22, 2018 (Tr. at 231-239, 240-246). Thereafter, Claimant filed a written request for hearing on March 13, 2018 (Tr. at 247-248).

An administrative hearing was held on July 10, 2019, before the Honorable David S. Lewandowski, Administrative Law Judge ("ALJ") (Tr. at 40-69). On August 27, 2019, the ALJ entered a partially favorable decision (Tr. at 10-39). On September 30, 2019, Claimant sought review by the Appeals Council of the ALJ's decision (Tr. at 307-309). The ALJ's decision became the final decision of the Commissioner on July 9, 2020 when the Appeals Council denied Claimant's Request for Review (Tr. at 1-6).

On September 2, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant

---

[1] Claimant subsequently amended her onset date to March 10, 2016, the day after a prior unfavorable decision (Tr. at 14, 44, 95-115).

(hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 13, 14) Subsequently, Claimant filed a Motion for Judgment on the Pleadings and a Memorandum in Support of Judgment on the Pleadings (ECF Nos. 19, 20), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 22). Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was considered a "younger person" on the amended alleged onset date and throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 28) Claimant has a limited education, having left school after the seventh grade, however, she is able to read and write. (Tr. at 28, 47) Claimant last worked in housekeeping and laundry services for hotels/motels. (Tr. at 47-50, 337)

## Standard

In a typical case, 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i) provide that a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). However, in cases concerning whether a claimant has achieved "medical improvement" and are no longer disabled, as in the case *sub judice*, the Commissioner bears the burden of establishing medical improvement. See, 42 U.S.C. § 423(f)(1); Lively v. Bowen, 858 F.2d 177, 181 n.2 (4th Cir. 1988); Pack v. Heckler, 740 F.2d 292, 294 (4th Cir. 1984); see also, Chrupcala v. Heckler, 829 F.2d 1269, 1274 (3d Cir. 1987)["Fairness would certainly seem to require an adequate showing of medical

improvement whenever an ALJ determines that disability should be limited to a specified period."].

It is noted that the "medical improvement" standard as set forth in the Regulations, *infra*, expressly applies in continuing review of benefits cases, and that the Fourth Circuit has not specifically addressed whether this standard applies in appeals concerning an award for a closed period of benefits followed by a determination that the closed period ended. Nevertheless, other courts have held that the "medical improvement" standard applies to closed period cases as well. See McKenzie v. Colvin, 2016 WL 182924, at *4 (D.S.C. Jan. 4, 2016) *report and recommendation adopted by*, 2016 WL 183907 (D.S.C. Jan. 14, 2016) (citing Waters v. Barnhart, 276 F.3d 716, 719–720 (5th Cir. 2002); Shepherd v. Apfel, 184 F.3d 1196, 1198 (10th Cir. 1999); Burress v. Apfel, 141 F.3d 875 (8th Cir. 1998); Jones v. Shalala, 10 F.3d 522, 523-524 (7th Cir. 1993); Pickett v. Bowen, 833 F.2d 288, 293 (11th Cir. 1987); McDaniel v. Astrue, No. 1:07-CV-779, 2009 WL 929555, at*3 n. 3 (M.D.N.C. Apr. 3, 2009)); Small v. Astrue, 2009 WL 3029737 (E.D.N.C. Sept. 22, 2009); Sagastume v. Colvin, 2015 WL 5735488 (D.Md. Sept. 29, 2015); Czerska v. Colvin, 2013 WL 5335406 (D.Md. Sept. 20, 2013); Fennell v. Berryhill, 2017 WL 4230557 (E.D.N.C. Aug. 31, 2017), *report and recommendation adopted by*, 2017 WL 4226039 (Sept. 22, 2017).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). However, once a claimant has been found disabled at any point in the sequential evaluation process, the Commissioner must determine if the disability continues through the date of the decision and further, whether there has

been sufficient medical improvement in a claimant's impairments such that the claimant is able to engage in substantial gainful activity. See 20 C.F.R. §§ 405.1594(a), 416.994(a). To determine whether a claimant continues to be disabled, the Commissioner follows an eight-step process for Title II claims and a seven-step process for Title XVI claims. The evaluation processes are essentially the same with the exception of the first step regarding substantial gainful activity, which applies only to Title II claims. Id. §§ 404.1520(b), 416.920(b), 404.1594(f)(1). The steps are as follows:

At step two for Title II claims and step one for Title XVI claims, the ALJ must determine whether the claimant has an impairment, or combination of impairments, which meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; if so, the claimant's disability continues. If not, the evaluation proceeds to the next steps. Id. §§ 405.1520(d), 416.920(d), 404.1594(f)(2), 416.994(b)(5)(i).

At steps three and two for Titles II and XVI claims, respectively, the ALJ must determine whether there been medical improvement as shown by a decrease in the medical severity of the impairment(s) as established by improvement in symptoms, signs or laboratory findings. If so, the analysis proceeds to step four for the Title II claim and to step three for the Title XVI claim. If not, the adjudicator proceeds to steps five and four, respectively. Id. §§ 404.1594(f)(3), 416.994(b)(5)(ii).

At steps four and three for Titles II and XVI claims, respectively, the ALJ must determine if there was any medical improvement related to the ability to work (i.e., does it result in an increase in the claimant's capacity to perform basic work activities; has there been an increase in the claimant's residual functional capacity ("RFC")). If yes, the analysis continues to steps six and

five for Titles II and XVI claims, respectively. If not, the analysis proceeds to steps five and four, respectively. Id. §§ 404.1594(f)(4), 416.994(b)(5)(iii).

At steps five and four for Titles II and XVI claims, respectively, the ALJ must determine if there an exception to medical improvement. If there is not, the claimant's disability continues. If an exception from the first group of exceptions to medical improvement applies (i.e., substantial evidence shows that the claimant has benefited from "advances in medical or vocational therapy or technology" or "undergone vocational therapy" if either is "related to [the] ability to work"), see Id. §§ 405.1594(d), 416.994(b)(3), then the adjudicator proceeds to steps six and five for Titles II and XVI claims, respectively. If an exception from the second group applies (i.e., disability determination was fraudulently obtained, claimant was uncooperative, unable to be found, or failed to follow prescribed treatment, see Id. §§ 405.1594(e), 416.994(b)(4), the claimant's disability ends. Id. §§ 405.1594(f)(5), 416.994(b)(5)(iv).

At steps six and five for Titles II and XVI claims, respectively, the ALJ must determine if the claimant's current combination of impairments is severe. If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant's disability ends. If they do, then the analysis proceeds to the seventh and sixth steps for Titles II and XVI claims, respectively. Id. §§ 405.1594(f)(6), 416.994(b)(5)(v).

At steps seven and six for Titles II and XVI claims, respectively, the ALJ must determine if the claimant possesses the RFC to perform past relevant work. If so, the claimant's disability ends. If not, the analysis proceeds to the final steps in the sequential evaluation processes. Id. §§ 405.1594(f)(7), 416.994(b)(5)(vi).

At the final steps in deciding Title II and XVI claims, the ALJ must determine if the claimant's RFC, when considered with the claimant's age, education, and work experience, allow the claimant to do other work. If it does, the claimant's disability ends. If not, then the claimant's disability continues. Id. §§ 405.1594(f)(8), 416.994(b)(5)(vii).

### Summary of ALJ's Decision

In this case, the ALJ found Claimant met the insured status requirements through December 31, 2017. (Tr. at 17, Finding No. 1) At the first step, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date. (Id., Finding No. 2) At the second inquiry, the ALJ found that since her alleged onset date of December 15, 2012, Claimant had the following severe impairments: cervical and lumbar degenerative disc disease; bilateral hip and left ankle osteoarthritis; left shoulder impairment; right knee meniscal tear as of July 22, 2017, and subsequent osteoarthritis status post total knee arthroplasty; and obesity. (Id., Finding No. 3) At the third inquiry, the ALJ concluded that since December 15, 2012, Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 18, Finding No. 4)

The ALJ then found that prior to July 22, 2017, Claimant had the residual functional capacity ("RFC") to perform light work except:

> The claimant could frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds. She can occasionally engage in crawling and frequently engage in balancing, stooping, kneeling, and crouching. She can frequently reach with the left (non-dominant) upper extremity except she can only occasionally reach overhead with the left upper extremity; can occasionally be exposed to extreme cold, extreme heat, wetness, and humidity. The claimant can occasionally be exposed to vibration and atmospheric conditions as defined in the Selected Characteristics of Occupations. The claimant cannot tolerate exposure to unprotected heights or moving mechanical parts.

(Tr. at 19, Finding No. 5)

The ALJ next found that from July 22, 2017 through June 18, 2019, Claimant had the RFC to perform sedentary work except she could

> stand and/or walk one hour. She can occasionally climb stairs and ramps, balance, and stoop but cannot kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. She cannot push, pull, or operate foot controls with the right lower extremity. The claimant can frequently reach with the left (non-dominant) upper extremity except she cannot reach overhead with the left upper extremity. She should avoid concentrated exposure to temperature extremes, vibrations, wetness, humidity, pulmonary irritants, and industrial hazards; and required use of a cane to ambulate. The claimant would need to elevate her right leg at least waist-high.

(Tr. at 27, Finding No. 6) At step four, the ALJ found Claimant was not capable of performing any of past relevant work. (Tr. at 28, Finding No. 7) Next, prior to July 22, 2017, in addition to the immateriality of the transferability of job skills, based on Claimant's age, education, work experience, and RFC, the ALJ determined that Claimant was capable of performing other jobs that exist in significant numbers in the national economy. (Id., Finding Nos. 8-11)

However, from July 22, 2017 through June 18, 2019, the ALJ determined Claimant had been under a disability. (Tr. at 29-30, Finding Nos. 12, 13[2], 14)

The ALJ then determined that since June 19, 2019, Claimant's disability ended, as she has not developed any new impairment or impairments, and her current severe impairments are the same as were present from July 22, 2017 through June 18, 2019. (Tr. at 30, Finding No. 15) The ALJ found that Claimant experienced medical improvement as of June 19, 2019. (Id., Finding No.

---

[2] Claimant argues in her brief that the ALJ's Findings Nos. 13 and 14 are "inconsistent" and therefore the decision is "deficient on its face" (ECF No. 20 at 13). The undersigned has determined that Finding No. 13 is a scrivener's error and for the sake of simplicity and judicial economy, Claimant's appeal on this particular ground will not be addressed further herein: "The claimant was not disabled prior to July 22, 2017, but became disabled on that date and has continued to be disabled through the date of this decision[.]" (Tr. at 30) Clearly, the ALJ had found Claimant to be disabled from July 22, 2017 through June 18, 2019 in Finding Nos. 12 and 14 (Tr. at 29, 30) and Claimant's appeal concerns the ALJ's finding that she had medical improvement since June 19, 2019 through the date of the decision.

16) The ALJ then determined that the medical improvement is related to the ability to work because there has been an increase in Claimant's RFC. (Id., Finding No. 17)

The ALJ then found that since June 19, 2019, Claimant had the RFC to perform sedentary work except she

> Can occasionally perform postural activities but cannot climb ladders, ropes, or scaffolds. She can occasionally push, pull, or operate foot controls with the right lower extremity. She can frequently reach with the left (non-dominant) upper extremity except she cannot reach overhead with the left upper extremity. She should avoid concentrated exposure to temperature extremes, vibrations, wetness, humidity, pulmonary irritants, and industrial hazards. The claimant requires the use of a cane to ambulate.

(Tr. at 30-31, Finding No. 18) Because Claimant's age category and education level had not changed since June 19, 2019, the ALJ found that beginning June 19, 2019, based on her age, education, work experience and RFC, there are jobs in significant numbers in the national economy that she can perform. (Tr. at 31-32, Finding Nos. 19-21)

Finally, the ALJ determined that Claimant's disability ended June 19, 2019 and she has not become disabled again since that date. (Tr. at 32, Finding No. 22)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ's finding medical improvement as of June 19, 2019 is not supported by substantial evidence, because the ALJ failed to consider Claimant's testimony, and instead downplayed her complaints (ECF No. 20 at 6-10). While Claimant would concede there was some improvement in her medical condition due to her right knee replacement surgery, the ALJ nevertheless did not provide the proper analysis for her subjective complaints or an explanation as to how he found she was capable of substantial gainful activity since June 19, 2019. (Id. at 11) Claimant also contends that the ALJ misinterpreted Claimant's shoulder impairment:

that she was offered surgery for same, but that she declined or failed to schedule the procedure. (<u>Id</u>. at 11-12) Claimant argues that while the ALJ limited her RFC to frequently reaching except for overhead with her left upper extremity, the ALJ nevertheless failed to consider other activities, as sedentary work necessarily requires good use of both hands and arms. (<u>Id</u>. at 12-13)

Claimant asks this Court to grant her motion and direct that she be found disabled or remand this matter for further proceedings. (ECF No. 19)

In response, the Commissioner argues that the medical evidence of record clearly demonstrated that Claimant had medical improvement since June 19, 2019, therefore the ALJ's finding is supported by substantial evidence. (ECF No. 22 at 8-10) Further, the ALJ did consider Claimant's testimony in his decision, and even based certain RFC limitations almost solely off them. (<u>Id</u>. at 10-11) Regarding Claimant's left arm limitations, the Commissioner asserts the ALJ's findings are also supported by substantial evidence based on the medical, opinion, and other evidence of record, including Claimant's testimony. (<u>Id</u>. at 11-15) The Commissioner asks this Court to affirm the final decision. (<u>Id</u>. at 17)

### The Relevant Evidence of Record[3]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

<u>Evidence Related to Right Knee Impairment:</u>

On July 22, 2017, Claimant hurt her knee when she slipped on pavement and fell into a hole (Tr. at 720). Almost five months later, Claimant underwent surgery to fix her knee, which included fixing a partial meniscal tear (Tr. at 801-802). Despite the surgery, Claimant continued

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

to experience pain in her right knee, and consequently her entire knee was replaced (Tr. at 799-800). Due to complications with the replacement, Claimant ultimately required a revision surgery, which occurred on March 22, 2019 (Tr. at 1018, 1026). Less than two weeks after her revision surgery, Claimant began physical therapy to strengthen her knee, increase the range of motion, reduce pain, and resume ambulation without an assistive device (Tr. at 970-984, 991-992).

At the onset of physical therapy, Claimant told her therapist that her knee already felt much better than before surgery (Tr. at 980). Throughout therapy, Claimant showed improvement (see, e.g., Tr. at 978-979, 970-974). On May 13, 2019, she told her therapist that her doctor was very pleased with her progress (Tr. at 973). On June 3, 2019, her therapist continued to note improvement in Claimant's range of motion and function as well (Tr. at 971). On June 5, 2019, her therapist noted that although Claimant reported some difficulty going down her steep trailer steps with reciprocal steps, she has no difficulty with standard height steps, and she had resumed all normal activities of daily living (Tr. at 971). On June 12, 2019, the therapist found Claimant met most of her functional goals with the exception of sustained weight bearing activity still being limited by knee pain, though she has a fluid and reciprocating gait without an assistive device; it was also noted that Claimant's right balance was better than her left. (Tr. at 970) The therapist also noted that Claimant's insurance was unlikely to cover an extension of physical therapy "due to high level of function" (Id.). On her last day of physical therapy, June 13, 2019, Claimant reported that she felt equally stable on her right and left legs during multidirectional resisted lunges (Id.). The therapist noted that she had good coordination with two-direction weight shifting on a mobile balance platform and that her gait was symmetric, reciprocating and fluid; the therapist summed up the results of therapy as "the functional goals of therapy [were] met" (Id.).

Claimant's surgeon reported similar findings: In a treatment note dated April 9, 2019, Claimant's surgeon noted she was doing well post-operatively and that she did not have any complaints, including minimal pain (Tr. at 1026, see also Tr. at 953 ("She is in [physical] therapy and seems to be doing well."; Tr. at 955 ("[right] knee pain is improving")). An x-ray of the right knee taken that day showed well-positioned and aligned implants with no evidence of loosening, fractures, or dislocations (Tr. at 1026). On June 18, 2019, Claimant's doctor again noted that she was doing well post-operatively and did not have any complaints (Tr. at 1030). Upon review of Claimant's systems, she was found negative for knee pain (Id.), and she was encouraged to stay as active as possible (Tr. at 1031). A follow-up appointment was scheduled for March 2020 (Id.).

Evidence Related to Left Shoulder Impairment:

In January 2016, in an ALJ proceeding related to her previous application for benefits, Claimant testified that she would experience pain in her left shoulder if she reached her left arm overhead, but that it was fine if she held it out (Tr. at 82). In December 2018, Claimant told her doctor that she fell and aggravated her left shoulder (Tr. at 916). She received an x-ray at the emergency room, but it "was normal other than a small calcium deposit" (Id.). After reviewing the x-ray, her doctor ordered an MRI (Tr. at 918), which confirmed the small calcium deposit, but was also otherwise unremarkable (Tr. at 922-923). Specifically, it showed "normal anatomy and labrum intact" (Tr. at 921, see Tr. at 922-923). Claimant received a cortisone shot in her shoulder (Tr. at 922). Initially, the injection improved her left shoulder pain, allowing Claimant to laterally abduct whereas beforehand she was unable to do so (Id.). On a return visit in January 2019, Claimant reported that since her fall, she was moderately limited in her ability to get dressed or do her hair; that activity made her pain worse, but was relieved by pain medication. (Tr. at 919)

However, by April 2019, Claimant's doctor noted she had no relief after physical therapy and cortisone injection treatment and offered her surgery; she was advised to call to schedule surgery if her pain worsened prior to her next appointment on June 25, 2019 (Tr. at 962). During the next appointment on June 25, the provider again noted that Claimant could schedule surgery if her pain worsened prior to her next appointment on July 19, 2019 (Tr. at 1041).

During this period, Claimant also attended physical therapy for her knee, *supra* (Tr. at 978-979, 970-974). There is no record of Claimant complaining to her physical therapist about her shoulder or indicating that she had any functional limitations with her shoulder during those therapy sessions from April through June 2019 (Id.). In a treatment record dated June 5, 2019, her physical therapist noted that Claimant had resumed all normal activities of daily living; Claimant also reported that she was doing her exercises at home and hoped to return to the gym soon (Tr. at 971).

At the initial and reconsideration levels, in October 2017 and February 2018 respectively, state agency consultants did not indicate that Claimant had any limitations in reaching with her left arm, though they did find she could occasionally lift and/or carry (including upward pulling) 20 pounds occasionally, and 10 pounds frequently, and was similarly limited in pushing and pulling (Tr. at 124-125, 139-140, 159-160, 177-178). No manipulative limitations were found (Id.).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that since her knee surgeries and physical therapy, she has used a cane ever since. (Tr. at 52) She stated that her knee still hurts and her lower back is constantly burning and aching; injections to her back have not helped the pain. (Tr. at 53) She also endorsed pain and

stiffness in her hips and she gets the best relief from lying down on her side with a pillow between her legs. (Tr. at 58) She does exercises, and she plans to go back to the gym about three times a week. (Tr. at 59) Claimant testified that exercise "feels good" when she does it, but later on in the evening she gets stiff again. (Tr. at 60)

Regarding her shoulder, Claimant testified that "it is full of calcifications" and the only thing left to do for it is surgery. (Id.) She stated that she can lift a total of ten pounds, but she has to use both hands. (Tr. at 54)

Claimant testified that her pain interferes with her concentration and that her medication makes her drowsy. (Tr. at 55-56)

She testified that she is right-handed. (Tr. at 58) She can do light housework, such as making her bed, or wash a dish and light dusting. (Id.) Claimant has a friend who stops by about three times a week to help with the housework. (Id.) Claimant indicated that she can take care of herself as far as taking a shower, bath, and washing her hair: "I hop in the shower and get out probably ten minutes and I'm done." (Id.) She can fix herself sandwiches and usually microwaves her meals. (Tr. at 58, 59)

Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume a person of Claimant's age, education, work experience, and with the controlling RFC, *supra*, to determine if she could perform other jobs. (Tr. at 63-65) In response, the VE testified that the individual could perform the work of an order clerk, inspector, or ampoule sealer. (Tr. at 64-65) The VE also testified that if the individual had to elevate one leg at least knee-high during work hours, the individual would be unable to maintain employment. (Tr. at 65) The VE further opined that these jobs permitted sitting and standing and changing

14

positions at will so long as the individual stays on task at the workstation. (Tr. at 66-67) These jobs also require frequent use of the hands, not constant. (Tr. at 67)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Evaluation of Symptoms in Disability Claims:

Claimant has argued that the ALJ's RFC assessment does not comply with Social Security Ruling ("SSR") 16-3p because he did not consider Claimant's testimony concerning her abilities and limitations, thus, his finding that there was medical improvement since June 19, 2019 is not

supported by substantial evidence (ECF No. 20 at 8-11).

SSR 16-3p clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and

other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Additionally, the Regulations provide

that:

> [w]e will consider all of the evidence presented, including information about your
> prior work record, your statements about your symptoms, evidence submitted by
> your treating, examining, or consulting physician or psychologist, and observations
> by our employees and other persons . . . Factors relevant to your symptoms, such
> as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or
> have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your
> pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms
> (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on
> a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to
> pain or other symptoms.

Id. §§ 404.1529(c)(3), 416.929(c)(3).

To the extent that Claimant contends that the ALJ "does not appear to give any

consideration to [her] hearing testimony" (ECF No. 20 at 9), this argument lacks merit.

Earlier in the written decision, the ALJ took note of Claimant's testimony regarding her

cane use since her first knee replacement. (Tr. at 19) The ALJ noted that although the record

showed Claimant using a cane between her two knee replacement surgeries, the record did not

show a provider prescribing a cane, and "it does not indicate a particular need to use a cane after

her second knee replacement, though she might have found some benefit from one for longer

distances." (Id.) The ALJ also observed that the record showed Claimant's "gait was unremarkable

by the end of her physical therapy visits." (Id.) In addition, the ALJ acknowledged Claimant's left

shoulder issues, noting "[a]lthough she reported difficulty dressing and doing her hair in December

2018 after a fall, the record does not show complaints of inability to perform activities of daily

living generally." (Id.) Of further interest here, later on in the written decision the ALJ again

considered Claimant's statements made during the hearing:

> The claimant testified that she had knee surgery, but it did not go well. She went to physical therapy three or four times without relief. She used a walker after the surgery, and now uses a cane. Her left knee has arthritis also. Her low back is constantly burning. Her left shoulder is full of calcifications, and the only thing that can be done is surgery. She can probably lift 10 pounds with both hands. Her shoulder gets tight when she tries to look down while sitting. She has arthritis in both feet. She suffers pain all day long. She can only stand 15 minutes before changing positions, and she has to use her cane while standing.
>
> She suffers stiffness in her knee, hips, and low back while standing. She can walk about a block with her cane. She can sit about 20 minutes before getting stiff. She does light housework and microwaves meals. At the gym, she uses the treadmill for 10 minutes, she uses a rowing machine[4], and she uses a machine that gives resistance. She has only gone to the gym once, but plans to go three times a week for several months. She is at the gym 45 minutes to an hour. Doing the gym activity feels good, but she is stiff later.

(Tr. at 20)

Next, following his review of the objective medical evidence of record, the ALJ performed

the requisite credibility/consistency analysis endorsed by Craig v. Chater, 76 F.3d 585, 594 (4th

Cir. 1995). (Tr. at 20-26) The ALJ determined that Claimant's "statements concerning the

intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the

---

[4] From the undersigned's review of the transcript from the hearing, it does not expressly state that Claimant used a "rowing machine", but in response to her attorney's question as to what she does at the gym, Claimant responded:

> I do get on the treadmill for like probably ten minutes, I'll get off of that. They have like these little robot thingies that's got water in 'em, I get on those and I try to work my leg. . . . I keep it in stiff. I try the stair steppers I can't do that so, those are the only two things that I do well and then they got this thing where they open your legs and you close 'em.

(Tr. at 59) The Supreme Court has instructed that under the substantial evidence standard of review, the Court defers to the presiding ALJ "who has seen the hearing up close." See Biestek v. Berryhill, 139 S.Ct. 1148, 1157 (2019). In other words, given that the ALJ was present during the hearing and could hear and observe Claimant and her responses to inquiries, the undersigned is hard-pressed to disagree with the ALJ's reasonable finding that Claimant used a rowing machine as opposed to "robot thingies" while at the gym.

medical evidence and other evidence of record." (Tr. at 25)

Throughout the written decision, and pertinent to the ALJ's determination that Claimant was no longer disabled as of June 19, 2019, the ALJ discussed the medical evidence related to Claimant's right knee impairment: Soon after her total knee arthroplasty, on April 3, 2019, Claimant "reported less pain and better range of motion" and Claimant's physical therapist "noted she had good exercise tolerance – she did not exhibit pain." (Tr. at 24, 980) The ALJ also referenced a treatment note from Claimant's primary care provider dated April 4, 2019 that she was doing well, and that on examination, "she had several staples on the right knee and edema around the surgical site. Her range of motion was good." (Tr. at 24, 952-958) The ALJ also noted that physical therapy records indicated that although Claimant reported morning stiffness in her knee that lasted about twenty minutes, she could tolerate weight-bearing activity for thirty minutes and that by April 29, 2019, Claimant reported "she felt her knee was getting better 'for the most part[]' " and the therapist observed "a much improved gait pattern after the session." (Tr. at 24, 978) It was further noted that Claimant was not only provided an updated physical therapy prescription, but also encouraged to stay as active as possible and to continue physical therapy. (Tr. at 24, 1015-1034) The ALJ also noted that treatment records from May 23, 2019 indicated continued improvement in Claimant's knee, and that by June 12, 2019, Claimant reported being able to do twenty minutes of continuous weight-bearing activity, but would need to sit down, "[o]therwise her knee was doing well" and she felt ready to finish therapy. (Tr. at 25, 972, 970) The ALJ further noted that Claimant's gait was fluid and reciprocating and that her "right single leg balance was actually better than her left" and she was unlikely to receive further insurance coverage due to her high level of function. (Tr. at 25, 970) Finally, the ALJ considered a treatment

note from Claimant's orthopedist from June 18, 2019, who noted she was doing well and had no complaints, save some stiffness and mild pain in her knee and that she was staying as active as possible. (Tr. at 25, 1015-1034)

Regarding Claimant's left shoulder impairment, the ALJ recognized that medical record demonstrated that Claimant has a lengthy history of arm pain (see, i.e., Tr. at 20, 444): "She had the issue for about 14 years, but it worsened after a fall on December 1, 2018." (Tr. at 24, 915-923) However, the ALJ noted that following her fall, Claimant's left shoulder condition caused her difficulty in doing her hair and dressing, although "the record does not show complaints of inability to perform activities of daily living generally." (Tr. at 19) An orthopedic provider record from December 6, 2018 noted that Claimant reported that her "shoulder issue moderately limited her activities. It was very difficult for her to get dressed or do her hair." (Tr. at 24, 915-923) The ALJ noted that Claimant's forward elevation was 40 degrees and her abduction was 40 degrees as well as weak external rotation. (Id.) An imaging study from December 14, 2018 "showed [no] labral tear and shoulder instability."[5] (Id.) The ALJ noted that on April 30, 2019, Claimant reported her left shoulder pain improved "somewhat" after receiving a cortisone injection and that Claimant's forward elevation was 150 degrees, however, her abduction remained at 40 degrees and she still had weak external rotation; he further noted that Claimant "could call to schedule surgery if her pain worsened prior to the next visit." (Tr. at 24, 959-963) Finally, the ALJ noted that on June 25, 2019, Claimant's "shoulder provider had the same examination findings as before." (Tr. at 25, 1035-1042)

---

[5] From the undersigned's review of the medical record, it is clear that the ALJ's omission of "no" or otherwise indicating that the imaging study was negative is due to scrivener's error. (See, Tr. at 922) Indeed, the provider treatment note dated January 3, 2019 states that the MRI revealed "normal anatomy and labrum intact." (Tr. at 921)

While the ALJ acknowledged Claimant had chronic pain as well as other impairments that would negatively impact her functioning, from the aforementioned medical record, the ALJ determined that Claimant's allegations were not disabling: for instance, the ALJ noted that though she complained of pain and stiffness from standing and walking on May 7, 2019, she only complained of stiffness on May 23, and that she planned to return to the gym then. (Tr. at 31) Again noting that she reported being able to do twenty minutes of weight-bearing activity, but then would have to sit afterwards, the ALJ determined "this indicates ambulation ability about consistent with the sedentary exertional level." (Id.) Again, the ALJ noted that Claimant reported no complaints on June 18, 2019, "other than some stiffness and mild pain in her knee occasionally", and she "essentially had full range of motion", further "indicat[ing] significant ambulation ability, consistent with the sedentary level of standing/walking." (Id.) The ALJ further noted Claimant's provider advised her to stay as active as possible, "indicating she did not have precautionary restrictions", and that the record "does not indicate in particular whether she used a cane, but she might need a cane for ambulation for longer distances." (Id.)

With respect to her left shoulder, the ALJ observed that the record "does not show a great worsening" of this impairment, save for the December 2018 fall, however, "she only reported her shoulder moderately limited her activities. She only noted she had great difficulty dressing and doing her hair, which would involve overhead reaching." (Id.) The ALJ noted that Claimant's "forward elevation was only 40 degrees then, but it improved to 150 degrees by April 2019." (Id.) Further, the ALJ noted that Claimant reported her shoulder was better then and had only "spurts of pain." (Id.) Again, the ALJ noted that Claimant was given the option for surgery, but there is no record that it was scheduled. (Id)

In sum, the ALJ determined that based on the record, Claimant would not be able to reach overhead, but she was not as limited in reaching in other directions, and she did not complain of limitations in other activities of daily living, thus, she could perform at the sedentary exertional level of lifting and carrying. (Id.) The ALJ also determined that Claimant's spinal degeneration or hip osteoarthritis conditions had not worsened to reduce her to below the sedentary level. (Id.)

The undersigned notes that in Hines v. Barnhart, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing Craig v. Chater, 76 F.3d at 595).

Recently, the Fourth Circuit emphasized the adjudicator's role in evaluating subjective symptoms: "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). The Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. It is important to recognize that in Arakas, the Court concluded that substantial evidence did not support the ALJ's finding that the claimant's subjective complaints were inconsistent with her daily activities because the overall record actually supported her subjective complaints and demonstrated she would be unable to engage in substantial gainful activity. Id. Another significant, if not critical, aspect of the Arakas holding is that the Court found the ALJ's analysis included misrepresentations or overinflation of

the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. Id. For purposes herein, this Court must determine if the subject ALJ's analysis relied primarily on the lack of objective medical evidence as the reason for discounting Claimant's complaints.

The foregoing demonstrates that the ALJ in this case did not overinflate Claimant's capabilities while ignoring the evidence tending to support her allegations of functional limitations; the ALJ herein did not make factual misrepresentations or misinterpretations of the evidence of record in order to make a nondisability finding. Indeed, given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is solely responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig v. Chater, 76 F.3d at 589. In this case, it appears that the ALJ paid close attention to the objective medical evidence from the relevant period(s), which included Claimant's reports concerning her pain and other symptoms, or lack thereof, as well as what helped her pain and other symptoms, and what did not relieve them; the ALJ then compared this evidence to Claimant's current allegations of pain and other alleged symptomology.[6]

In short, the ALJ's discussion involved a thorough review of the conflicting medical and other evidence requiring some reconciliation. Accordingly, to the extent Claimant contends the ALJ did not comply with SSR 16-3p, the undersigned **FINDS** this contention lacks merit, the

---

[6] Upon judicial review, the Commissioner's factual findings are " 'conclusive' if supported by 'substantial evidence.'" See Biestek v. Berryhill, 139 S.Ct. at 1153 (2019). Moreover, given that substantial evidence is "more than a mere scintilla" and "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 1154 (internal quotation omitted).

undersigned further **FINDS** that the ALJ's assessment of Claimant's subjective complaints is supported by the substantial evidence. Moreover, to the extent Claimant argues that the ALJ's analysis and explanation for his finding Claimant experienced medical improvement since June 19, 2019 is deficient, the undersigned **FINDS** the ALJ's analysis and explanation for same is also supported by the substantial evidence.

The RFC Assessment and SSR 96-9p:

Claimant has alleged that the RFC assessment is flawed to the extent that the ALJ improperly underestimated her limitations related to her left shoulder impingement by misinterpreting a treatment note concerning scheduling her for surgery as well as overestimating her reaching capabilities. (ECF No. 20 at 11-13)

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. Id. §§ 404.1546(c), 416.946(c).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted); see also Felton-Miller, 459 F. at 231.

To the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence, this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). As noted *supra*, the ALJ provided a comprehensive review of the record evidence, which included Claimant's testimony and subjective statements, her daily activities, the objective medical findings, the treatment history, as well as the medical opinion evidence.

Although Claimant asserts that the ALJ's couching her shoulder surgery as an option she did not take as determinative that this impairment was less severe than it is, the fact remains that the evidence before the ALJ at the time did not include shoulder surgery. Indeed, the ALJ acknowledged Claimant's testimony that "the only thing that can be done is surgery" (Tr. at 20), however, as mentioned *supra*, the ALJ also noted that Claimant herself reported to her provider that she received some relief from the cortisone injection. He also noted that the imaging studies of her shoulder were unremarkable, the plan for surgery notwithstanding.

Regarding the ALJ's finding Claimant is restricted from overhead reaching with her left upper extremity, Claimant concedes the ALJ acknowledged her difficulties in doing her hair and dressing, but contends these activities are not limited to overhead reaching. (ECF No. 20 at 12) To be sure, dressing involves buttoning buttons, pulling up pants, putting on socks and shoes, etc. (Id.) However, as noted *supra*, the ALJ considered the medical evidence that showed Claimant's ranges

of motion in her upper left extremity: that her forward elevation improved from 40 degrees to 150 degrees, though her abduction remaining at 40 degrees and she continued to have weak external rotation; the ALJ also considered Claimant's own statements concerning her abilities, which included doing light housework, microwaving meals, lifting ten pounds with both hands, and using a rowing machine, all of which would require some use of her upper extremities. Significantly, however, the ALJ also noted that the record is devoid of evidence that Claimant had difficulties in performing gross and fine movements (Tr. at 19), or that she had weakness in her left upper extremity (Tr. at 25), or that she reported dropping things or having manipulation problems (Tr. at 25-26).

While Claimant does not demonstrate how the ALJ's restriction to overhead reaching prejudices her, she refers to SSR 96-9p, which underscores the importance of having bilateral manual dexterity for sedentary jobs (ECF No. 20 at 13). SSR 96-9p provides that:

> If an individual is unable to lift 10 pounds or occasionally lift and carry items like docket files, ledgers, and small tools throughout the workday, the unskilled sedentary occupational base will be eroded. The extent of erosion will depend on the extent of the limitations. For example, if it can be determined that the individual has an ability to lift or carry slightly less than 10 pounds, with no other limitations or restrictions in the ability to perform the requirements of sedentary work, the unskilled sedentary occupational base would not be significantly eroded; however, an inability to lift or carry more than 1 or 2 pounds would erode the unskilled sedentary occupational base significantly. For individuals with limitations in lifting or carrying weights between these amounts, consultation with a vocational resource may be appropriate.

See, SSR 96-9p, Policy Interpretation Ruling Titles II and XVI: Determining Capability to do Other Work--Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work, 1996 WL 374185, at *6.

> Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the

fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.

Id. at *8.

As noted *supra*, there was no evidence of Claimant exhibiting such limitations when the ALJ determined the post-June 19, 2019 RFC assessment that would have significantly eroded the occupational base. Claimant's argument that the ALJ's overhead reaching restriction to her left upper extremity is erroneous is akin to a request that this Court should re-weigh the evidence, however, any conflicts within the evidence of record, as stated *supra*, is for the ALJ to resolve, not this Court. See also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, such as imaging and examination findings, as well as the other evidence of record, including Claimant's own statements and testimony; the ALJ's thorough discussion of all this evidence, and the ultimate determination that Claimant remained capable of performing less than a full range of sedentary work since June 19, 2019 provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Id. at 637.

The undersigned therefore **FINDS** that the RFC assessment since June 19, 2019 with respect to Claimant's upper left extremity is supported by the substantial evidence. The undersigned further **FINDS** that the final decision that Claimant's disability ended June 19, 2019 is also supported by the substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court

**DENY** the Claimant's request for reversal or remand (ECF No. 19), **GRANT** the Defendant's request to affirm the decision below (ECF No. 22), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: June 25, 2021.



Omar J. Aboulhosn
United States Magistrate Judge